# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:06cv512

| | | |
|---|---|---|
| **GERARD ECKHARDT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **Vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **BANK OF AMERICA, N.A.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court in accordance with 28, United States Code,

Section 636(c) and upon defendant's Motion for Summary Judgment. Defendant

seeks judgment in its favor on plaintiff's claims under the Americans with Disabilities

Act (hereinafter "ADA")[1] and on his supplemental state law claim for negligent

infliction of emotional distress (hereinafter "NIED"). For the reasons that follow, the

court finds that plaintiff has proffered evidence upon which a reasonable jury could

find both a *prima facie* case and pretext under the ADA. Further, the court finds that

the evidence is not sufficient on plaintiff's common law NIED claim and will grant

_____

[1]      The court notes that plaintiff has asserted a claim under the North
Carolina Equal Employment Practices Act and defendant has moved for summary
judgment on that claim also. Inasmuch as the NCEEPA claim is subsumed by the
ADA claim, they will considered together under the discussion of the ADA claim.

the Motion for Summary Judgment as to that claim.

## FINDINGS AND CONCLUSIONS

## I.    Factual Setting

For the limited purpose of the pending motion for summary judgment the court has considered the factual contentions in a light most favorable to plaintiff. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may or may not seem to be. The court has read every page of every document submitted by the respective parties and has considered them in reaching the decision announced herein. Because the summary judgment standard requires this court to do so, the court has drawn heavily from the factual recitation contained in plaintiff's opposing brief, in which plaintiff both properly and consistently makes specific reference to the evidentiary materials he has proffered. These findings are not binding on the court except for the limited purpose of disposing of the pending motion.

Plaintiff is a quadriplegic having sustained a back injury in 1979. Pl. Tr., at 100. In 1984, plaintiff completed an eighteen-month computer science and information systems certificate program for disabled individuals at the University of Pennsylvania. Pl. Tr., at 134-35. Before working for defendant, plaintiff was employed by Bell

Atlantic from 1985 through 1996 as a program analyst. In October 1996, plaintiff accepted a Systems Engineer position with NationsBank's (a predecessor to defendant) where he performed mainframe computer programming. Pl. Tr., at 7.

In 1998, Plaintiff was transferred to a new team (the "team") designing an application called Operational Credit Exposure ("OCE"). Pl. Tr., at 8. OCE is a risk-monitoring application for corporate bank commercial customers, which alerts business partners if the customers' financial positions with the bank become problematic. Pl. Tr., at 9.

In 2001, defendant promoted plaintiff to a team lead position. Pl. Tr., at 17. Plaintiff was one of the creators and primary developers of OCE and was "instrumental" in its creation and continued operation through various new versions. Krause Tr., at 268; Pl. Tr., at 15. Plaintiff was considered to be an expert on OCE. Kreutz Tr., at 103-04; Sparks Tr., at 71-72; Terr. Tr., at 231; Dowell Tr., at 16-17; Anderson Tr., at 99-100. In addition, plaintiff maintained relationships with OCE business partners, enabling him to communicate the business partners' requirements to the team. Statland Tr. 46, 48; Dowell Tr. 93. Plaintiff has presented evidence that he was performing his work in a manner that met his employer's reasonable expectations, and was valuable to the team and the success of OCE. Krause Tr., at 138, 267; Terr. Tr., at 232-33; Anderson Tr., at 81-82, 102; Sparks Tr., at 120;

Sylvester Tr., at 52-53; Dowell Tr., at 77. Further, plaintiff has presented evidence that he was never subject to any disciplinary action. Terr. II Tr., at 16; Dowell Tr., at 54; Krause Tr., at 192; Statland Tr., at 260-61.

Defendant also maintained a "talent chart" or "depth chart" ranking the strength and value of employees to defendant. Krause Tr., at 149; Rankin Tr., at 56, 59; Anderson Tr. 13-14. In 2004, plaintiff was the highest rated individual on the team and in the top ten-to-20 percent of the team's larger technology group.

In February 2004, plaintiff was removed from his team manager position to a consultant application programmer position ("CAP") by his manager, Jon Dowell. Dowell Tr., at 15. The move was not due to performance problems; rather, Dowell thought the team would be better served strategically with plaintiff out in front of the application, doing high-level design and gathering business requirements. Dowell Tr., 16. Plaintiff ceased being a team lead after that point. Dowell Tr. 74.

In March 2004, defendant hired Lisa Terranova as a CAP, who also reported to Dowell. Terr. Tr., at 15, 24. In the Summer of 2004, Terranova was promoted to the position of the team's application manager, which generated resentment on the team.

There is an issue of fact which arises at this point. Defendant contends that at the time it laid plaintiff off, plaintiff was a manager while plaintiff contends that he

had no role in management. Inasmuch as plaintiff is resisting summary judgment, the court will consider as correct plaintiff's version as it does find some support in the evidence he presents. As discussed above, plaintiff was demoted from his position as a team leader to that of a CAP, which did not entail several core job description duties for a team manager or technical manager. Terr. Tr., at 44; Statland Tr., at 85, 89-90; Krause Tr., at 33, 38; Dowell Tr., at 41. Plaintiff's duties as a CAP included the duties performed by other CAP's, specifically design and development work and application programming. Pl. Tr., at 38-39; Krause Tr., at 175; Terr. Tr., at 182. Plaintiff has also presented evidence that his fellow employee Jeff Sparks was a CAP and that Terranova's title change to CAP was an "error" and it was changed back to technical manager. Krause Tr., at 57. A reasonable inference that can be drawn from such evidence is that Sparks and plaintiff were not peers with Terranova. Pl. Tr., at 38.[2]

On January 1, 2005, Krause was promoted to team manager. Pl. Ex. 4. Plaintiff has presented evidence that she had no previous management experience with the defendant, no formal computer education, and that she was psychology major. Krause Tr., 21. Krause was also not based in Charlotte, but telecommuted from Georgia and

_____

[2] Defendant has its own evidence that plaintiff was a "team lead" at the time he was laid off. Inasmuch as the court does not weigh conflicting evidence on summary judgment, such evidence need not be mentioned at this point.

visited Charlotte one week per month or less. Krause Tr., at 28-29.

In April or May 2005, Mr. Globerson – an individual whose primary function with defendant appears to be cost reduction – asked Ms. Statland to assume responsibility for the Risk Group, including OCE. Statland Tr., at 34 & 104. Ms. Statland also worked from home in Maryland for a period of time and visited Charlotte once per month for two days. Statland Tr., at 31-32, 39. She later moved to Charlotte at the request of Globerson. At this point, the team was "dysfunctional" and plagued by "a lot of conflict," "a lot of arguing against each other" and "childish crap all the time," which was "scary" for Krause as a new manager. Krause Tr. 72-73, & 232; Statland Tr., at 158. Krause had "a lot of problems on that team" and it distracted her from doing her job. Krause Tr., at 213. Plaintiff was not the source of these problems.

Jeff Sparks was a fellow CAP with plaintiff. His work abilities were the equivalent of the plaintiff. No work evidence was introduced of any misconduct or disciplinary action against Mr. Sparks. While he was terminated on the same day as plaintiff, defendant rehired him within weeks.

Walter Terry was the least skilled member of the team. Dowell Tr. 59-60; Anderson Tr. 152. Such lack of skill resulted in job duties being transferred to others, including plaintiff. Krause knew about the removal of the job duties. Krause II Tr.,

at 117-18. Apparently, this team member also showed up at work drunk and drank alcohol during lunch. Krause II Tr., at 130. Despite this misconduct, Krause and Statland decided to only issue Terry a written warning because, according to Krause, he was working on the GTRM project at that time and she needed him and he was having family issues. Krause Tr., at 99; Statland Tr., at 148-49, 156. Statland did not alert Mr. Globerson of the problem with Terry. Statland Tr., at 161, 163. Plaintiff has also presented evidence from which one could infer that Krause and Statland's testimony regarding Terry and the reasons he was not disciplined are not true. Among the potentially impeaching evidence submitted are time sheets show that Terry was not billing any time to GTRM. Krause II Tr., at 162-63. Plaintiff also presented other evidence which could call into question such testimony. Further, plaintiff points to additional disciplinary problems with Terry which did not result in discipline by Krause and Statland and evidence that another manager in the bank ultimately terminated Terry for attempting to sell a Bank computer. Reading such in a light most favorable to plaintiff, he appears to present this evidence to make the point that he was more skilled and better disciplined than Terry and could have performed Terry's functions had defendant laid off Terry instead of him.

Plaintiff has also presented evidence as to fellow team member Robin Siegner, who he submits was "volatile", "confrontational" and an individual who "had a hard

time taking assignments from others." Krause Tr., at 78, 80). Siegner "hated everybody" on the team and openly wished that many of them would "go to hell" and was otherwise prone to "crazy ranting." Krause Tr. 230, 232-33; Terr. Tr. 241. Indeed, Siegner "complain[ed] constantly about others, in front of them and behind their backs" and behaved in a way that "ke[pt] [the OCE group] down" and otherwise "behaved very badly." Krause Tr. 102 & 117; Statland Tr. 170-71, 173. She reacted "childishly" and would "slam things around" on her desk in anger. (Terr. Tr. 98). Between November 2004 and April 2005, Terranova also had to have repeated discussions with Siegner about inappropriate use of SAMETIME messages in which she made "angry outbursts," "intimidating comments" and "sw[ore] at her co-workers." Pl. Ex. 21. Plaintiff points to an instant message where Siegner, in a discussion with Terranova, threatens plaintiff and uses expletives. Plaintiff contends that rather than disciplining Siegner, Terranova and Krause initially rewarded Siegner by transferring her from the Model Bank (where she worked with plaintiff) to the GTRM project. By April 19, 2005, Terranova viewed Siegner as a threat to the success of the team, stating in an instant message to Krause, "[i]f I cannot get Robin to stop putting up road blocks, we will not make it. If she starts on [Daley or Gammon on GTRM] we are screwed." Pl. Ex. 23; Terranova II Tr., at 83-85. By April 28, 2005, Terranova informed Krause:

> She is hounding Les [on GTRM]. I am ready to begin discussing a job action that will move her off the team…. Robin is so much more destructive to this group, she does not even deserve to stay, she will poison the group . . . . I am done with this. She can't stay here. We can't work this way any longer.

Pl. Ex., at 25; Terranova II Tr., at 89-90. Krause understood that Terranova wanted Siegner out of the group, but thought Terranova was just "throwing a fit." Krause II Tr., at 172-73. Krause did not even reply to or research Terranova's admonitions. Krause II Tr., at 173. Plaintiff presents evidence that undermines Krause's and Terranova's claim that it was always intended to move Siegner to GTRM. Krause II Tr., 166-68; Pl. Ex. 23. Apparently, Siegner's comments concerning plaintiff did not end when she was moved to GTRM. According to plaintiff, Krause concealed from Terranova and Statland that Siegner had sent a similar message that occurred after the decision was made to transfer Siegner to GTRM. Terr. Tr., at 135; Krause Tr., at 226; Statland Tr., at 177; Pl. Ex. 26. In that message, Siegner stated "I am f---ing sick of that worthless scum [Gerard Eckhardt]" . . . HIS SORRY A-- should have to support it since he allowed it."[3] Krause responded by encouraging Siegner to "vent," stating, "no good to keep it in" and "I understand and sometime [*sic*] you just have to get it out of your system." Krause Tr., at 224. Krause only issued a written warning to

---

[3]      Ms. Siegner was using foul curse words unacceptable in polite society or in any professional context. The court is using abbreviations as such words are inappropriate for publication.

Siegner and plaintiff takes issue with the favorable handling of such warning. Reading such in a light most favorable to plaintiff, he appears to present this evidence to make the point that he was more skilled and better disciplined than Siegner and could have performed Siegner's functions had defendant laid off Siegner instead of him, Krause Tr. 203, 243, and that plaintiff could have assumed her work on GTRM. Krause Tr., at 205.

Plaintiff also points to Yolanda Gammon as another person defendant could have laid off instead of him. Gammon had problems with a "non-team spirit" and "refusal to do her job" according to an action plan Krause created when she took over the team. Terr. Ex. 10; Krause II Tr. 193; Sparks Tr. 83. She refused to work with plaintiff and other teammates. Terr. Tr. II, at 15; Pl. Ex. 30.She was disrespectful and unprofessional toward her teammates and was "disruptive." Terr. Tr. 84-85. Gammon also had technical deficiencies in the way she coded that required Terranova to implement standards and to pull her off a project on or about June 2004. Terr. Tr. 100-01; II Tr. 15; Dowell Tr. 87-88. Gammon wrote code in an "antiquated and hard to follow" manner that was "very confusing" and presented operational challenges when changes were needed. Siegner Tr., at 41. Although she served as a technical lead on GTRM, Terranova and Gammon's former manager Dowell both viewed her as lacking the ability to lead and/or manage a team. Terr. Tr., at 166; Dowell Tr., at

115. Gammon also struggled in comprehending and translating business requirements described by her business partners. Kreutz Tr., at 75-77. By February 6, 2005, Terranova informed Krause via instant message that she was no longer interested in managing Gammon because of the "push back" she received from Gammon regarding her technical lead role on GTRM. Pl. Ex. 31; Terranova II Tr., at 29. Gammon was reacting angrily to doing her job on GTRM and referred to that project's "imminent failure." On July 22, 2005, Gammon physically assaulted Terranova in her cubical as Terranova was trying to address a personality conflict between her and Daley on GTRM. Terr. Tr., at 162. On July 31, 2005, Terranova messaged Krause and Statland and alerted them of conduct by Gammon and cautioned of an imminent assault. Terr. Tr., at 11. Terranova recommended that Gammon be terminated. Krause Tr., at 299. Krause refused to terminate Gammon because there were allegedly no corroborating witnesses, but potential witnesses were not interviewed. Plaintiff points to what he considers to be the false deposition testimony of Krause and Statland, who testified in their first depositions that they did not know Gammon was accused of physically touching Terranova. Krause Tr., at 318. Statland testified three separate times that Terranova "never" told her that Gammon physically touched her and added a fourth time "at no time had she ever told me that Yolanda physically grabbed her." Statland Tr., at 183, 185, 188, 276. Had Statland known of a physical element, "[she] would

have done much more investigation." Statland Tr., at 187. Such testimony is put into question by e-mails produced after those depositions pursuant to this court's orders. See Pl. Ex. 34a. Statland never informed Globerson about this incident. Statland Tr., at 191. Plaintiff presents this evidence to show that had Gammon been terminated, a vacancy on the team would have caused Statland to revisit plaintiff's layoff recommendation and possibly to have deselected him, Statland Tr., at 277-78, and that plaintiff could have performed all of Gammon's job duties.

Plaintiff has also presented evidence that Terranova was struggling in her role as a first time manager and harbored resentment for plaintiff based on his disability. Krause Tr., at 214. In a January 25, 2005 message, Terranova stated:

> Gerard, occasionally deviates [from having the rest of the world's best interests in mind], . . . due to his handicap, to bring the rest of the world, to a screeching halt, by bringing other's to his level of sadness and deep seated sorry by turning us against each other.

Pl. Ex. 36. Terranova stated further, "please know, that, just by putting this in writing, I put my job at risk, but somehow folks, I am willing to risk this." Pl. Ex. 38.

Plaintiff has presented evidence concerning an attempt by Krause to secure for him short term disability leave. Krause viewed plaintiff as "a little burned out" and under "emotional distress" and called the "Advice and Counsel" department about a short-term disability leave of absence on March 29, 2005. Krause Tr. 110. The Advice and Counsel report reflects several disability related comments purportedly

made by Krause:

> Manager [Krause] stated ee [plaintiff] is having performance issues. Mgr asking for advice regarding examined [*sic*] all options. EE does not have full range of motion with fingers. It takes longer, on average, to type an email. EE has missed project deadlines, recently, a project missed on 12/17. EE received counseling for this. Missed coding on a project that delayed testing in the first week of Jan. Other ee's had to be pulled from work to assist with project. EE did not communicate with mgr that he was going to miss deadlines. Mgr stdee was previous team lead, but not tech ldr without direct reports. Mgr believes ee is still using authority with prior dr. so she will research this info to clarify. Advsed mgr to ask about any needs he may have in order to meet his goals/objectives. Call back if ee states performance is related to disability. MGR asked about LOA, advsd mgr can tell ee about available resources. Mgr will do written email template.

Pl. Ex. 8 (nonstandard abbreviations in the original). Similarly, a spreadsheet Krause completed referenced under "action plans" for Plaintiff, "suggest short term leave it [*sic*] applicable." Pl. Ex. 10.

Plaintiff also points to Krause's statements to Siegner in a message to the effect that Krause had an unlawful motive toward plaintiff when she recommended him for layoff. In response to Siegner's message about plaintiff, Krause stated "don't you worry about Gerard anymore . . just know that it is being dealt with . . . as I told you before it will just take a little time to fix the situation." Pl. Ex., at 26.

While plaintiff presents evidence which he characterizes as Globerson making unnecessary layoffs that were not warranted by financial conditions, it appears that there is absolutely no evidence that Globerson was motivated or even knew of

plaintiff's impairment when he authorized and eventually approved plaintiff's layoff. Instead, the only evidence of Globerson's motivation appears to be personal financial gain that would come from finding efficiencies even if such efficiencies were not mandated. Ultimately, Globerson testified that he expected his managers to make an assessment of who they could afford to lose or couldn't afford to lose. Globerson Tr., at 199. Whatever his directions, Globerson did not press the managers to substantiate the decision; nor did he conduct any additional investigation. Globerson Tr., at 112-13. Indeed, it would appear from the evidence presented that Globerson delegated the decision making process to subordinates.

> What is important are the instructions he imparted to Statland, who recalled that
>
> when [she] began working for Mr. Globerson is when he informed his whole team [in a staff meeting] at that time that he wanted us to look at our staffing levels and to try and optimize the staffing levels looking for overlap in areas where responsibilities could be absorbed by others without having large impacts on deliveries.

Statland Tr., at 131. Statland's task was also to consider "the risk and the reward" of eliminating positions, including ensuring that there was no "business impact" caused by the layoff. Statland II Tr., at 21 & 69; Ex. 39. Statland conveyed these same instructions to Krause. It is undisputed that Statland and Krause were not constrained in any way in the factors they could consider in making their layoff recommendations. Statland Tr., at 196 & 222-23. They were not prohibited or discouraged from

considering performance, disciplinary history, or stack rankings. Krause Tr. 159-60; Statland Tr. 215-16, 234. They did not, however review actual evaluations, but testified in the first round of depositions that they considered performance in their layoff deliberations. Krause Tr., at 246; Statland Tr., at 234. Krause identified plaintiff missing deadlines and not communicating well in that regard as lay off considerations. Krause Tr., at 154-55. In turn, Krause and Statland compared the performance of Lisa Terranova to plaintiff. Krause Tr., at 171-72. Globerson acknowledged that "talent, experience, skills, teamwork and ability to function as a team member" would be useful inputs in "breaking a tie" where individuals were performing the same role or function. Globerson Tr., at 163, 123, & 173. When confronted with the removal of Terry's programming functions, Globerson testified that he would have expected that to be an input into the layoff selection, if it was a continuing issue. Globerson Tr., at 190-91.

When informed of Terry's additional drinking incident, Globerson admitted to being "somewhat surprised that it wasn't mentioned" to him by Statland in conjunction with the layoff. Globerson Tr., at 199-200. Globerson also stated that had the stack ranking showed that plaintiff was the top ranked person on the team (which he was), it would have caused a "double take" on Statland's layoff recommendation. Globerson Tr., at 135-37. Dowell testified that he would have also consulted the stack rankings if he

was pressed for a similar layoff recommendation. Dowell Tr. 125.

Krause also considered plaintiff's behavior with teammates in conjunction with her layoff recommendation. She testified that plaintiff "wasn't always really good at interacting with coworkers" and again referenced his "interpersonal interactions." Krause Tr., at 171-72.

Krause and Statland claim they walled themselves off from sources of information, although not required to do so by Globerson. Plaintiff contends that other sources of information could have reasonably assisted them in making an informed decision. They did not consult with Dowell or Anderson regarding the layoff selection, although they managed the same team. Krause Tr. 171; Statland Tr., 243. Anderson was also surprised to learn plaintiff was selected for layoff because of his status as the most knowledgeable member of the team, Anderson Tr., at 117-18, and he could only imagine laying off plaintiff if OCE was being retired or replaced. Anderson Tr., at 119. Krause and Statland also did not consult Terranova, who was responsible for the team of which plaintiff was a member, Terr. Tr., at 142, and who had direct contact in Charlotte with the team and the work being performed. Krause Tr., at 168-69; Terr. Tr., at 142. Unlike Krause, Terranova had the technical background to evaluate the programming skills of the team members. Krause Tr., at 236-37 & 316. Prior to June 2005, Terranova had already recommended that

Gammon be replaced due to her conduct in connection with GTRM and had requested that Siegner be removed from the team in late April 2005. Plaintiff also points to Statland's and Krause's failure to consult with the business partners despite the fact that a critical consideration in the layoff selection, laid out by Globerson, was that the business partners not be negatively impacted. Krause Tr., at 159; Statland Tr. 239; Statland II Tr., at 13-14. Krause anticipated "some backlash" from them by selecting plaintiff and Statland knew they would oppose plaintiff's layoff due to operational concerns. Krause Tr. 164; Statland II Tr. 138-39; Pl. Ex. 40.

Based on Krause and Statland's initial depositions, Ms. Statland did not make her layoff recommendation to Globerson until sometime in early to mid-June 2005. Krause made her layoff recommendations via telephone to Statland, in early June 2005. Krause Tr., at 142 & 244. After Statland received Krause's recommendation, she completed her own investigation before making her recommendation to Globerson in a staff meeting. The recommendation that was made was that the plaintiff be terminated from his employment with the bank. Statland Tr. 229, 244. Statland and Krause then informed plaintiff as well as Spark in separate meetings on June 29, 2005, of their terminations.

When deposed a second time, Statland testified that she made her recommendation to Globerson on April 15, 2005, via e-mail. Pl. Ex. 42. Statland also

gave conflicting testimony as to the process of her layoff recommendation. In her second deposition, she testified that she made her initial layoff recommendation on April 15, 2005, but that layoff recommendations were "re-reviewed" by Globerson and direct reports and that she had an opportunity to change her recommendations, up until some point before the layoff announcements the end of June. Statland II Tr., at 58,63 &142.

Although Krause testified that she considered everyone on the team for layoff, she determined that there were three people "at the team manager level" and that she only needed one. Krause Tr., at 174. Krause explained, "it was at the team manager level that I could identify more overlaps in responsibilities." Krause told Terranova "there were three managers and they only needed one." Terr. Tr., at 140. As provided above, plaintiff has presented evidence that he was not a team manager at that time and neither was Sparks. Statland Tr., at 113-14. Krause also testified that plaintiff's selection was based on the hours he was billing to the OCE base application as those costs were not recoverable from a business partner and that she did not have enough hours to fund plaintiff "all the way" on the GTRM project or other projects. Krause Tr., 186. Plaintiff has presented evidence, however, that the GTRM project was under budget by $67,000 in May 2005 when the layoff selection was made. Pl. Ex. 43. Krause also testified that she may have allowed Sparks to bill to GTRM even though

he was working on other projects in order to "cover our FTE"[4] on GTRM. Krause II

Tr., 92. Further, Krause was contemplating adding two new positions to the team prior

to making her layoff selections. Pl. Ex. 10; Statland Ex. 44. Krause also justified

selecting plaintiff because she only had 1.25 FTE budgeted to OCE and those hours

were allocated to Lisa Terranova. Krause Tr., at 185. Plaintiff has submitted budget

records show that there were 2.0 FTE allocated to OCE base, enough to cover both

Terranova and plaintiff. Pl. Ex. 45.

Krause also testified that she consulted with a human resources official Mary

Rankin before making her layoff recommendation to ensure she complied with

disability laws. Krause testified that she consulted with Rankin before making her

recommendation for 30 to 40 minutes "to make sure because he was a disabled

associate, that everything was done by the book" and that Rankin questioned her about

whether she considered disability as a factor. Krause Tr., at 139-41 & 250. Rankin

had no recollection of any such consultation and added further that if Krause had

inquired about whether a layoff selection complied with disabilities law (as Krause

contends she did), Rankin "would have referred it to the personnel center." Rankin

Tr., at 23-25.

---

[4]    The court interprets FTE to be an abbreviation for "full time
employee."

Krause testified that "a lot of the team members had the same skills and did the same type of things, not necessarily on the same specific project or task. There's overlap everywhere." Krause Tr., at 174. Statland testified that there was the "most" or "largest" overlap at the "team lead" position, not that there wasn't overlap among the other positions. Statland Tr., at 245. On that point, Globerson acknowledged that two different managers could have looked at the exact same team and come up with different layoff recommendations. Globerson Tr., at 150.

Statland testified that she reviewed everyone's time sheets to determine where they were billing out to projects and determining who was spending the majority of time on recoverable items and looking at where there was overlap in management activities that were nonrecoverable. Statland II Tr., at 57. Statland created an overall spreadsheet that analyzed the staffing that she currently had based on her review of time sheets and the staffing she estimated she would need. Statland II Tr., at 166-69. Statland testified that she would have used the spreadsheet to justify her layoff selection to Mr. Globerson; however, the spreadsheet was deleted from her computer and has never been produced despite court orders.[5] Statland II Tr., at 166-71. Statland concluded that the team had three senior members, but only needed one senior

_____

[5] At the time of the charge conference the court will give consideration to an spoliation instruction concerning the absence of this document.

member and several "lower level[]" workers. Statland Tr., at 250. Yet, there were acknowledged risks associated with laying off plaintiff and Sparks, mainly the loss of "knowledge transfer" that might be needed down the line. Statland II Tr., at 119. Terranova had not attained that same level of knowledge on OCE as plaintiff. Statland Tr., at 121. Statland never considered whether Plaintiff could assume Gammon, Siegner or Terry's job. Statland Tr., at 269, 274-75. Statland testified that Terry was not selected for layoff because he had responsibilities assigned to him on both the Model Bank and the GTRM project that allegedly could not be picked up by someone else on the team. Statland Tr, at 268. Plaintiff has, however, submitted evidence that Terry did not bill one hour to GTRM. Plaintiff has presented evidence that he had earlier assumed Mr. Terry's programming duties before when they were removed in June 2004.

Similarly, Statland did not consider replacing Gammon as technical lead on GTRM with plaintiff, despite the problems Gammon was already having in that position and plaintiff's technical lead background. Statland II Tr., at 98.

In comparing Terranova and plaintiff, Statland did not ascertain how long plaintiff was the manager or how his performance in that position was regarded by Dowell or Anderson. Statland Tr., at 256, 259. Statland relied on an assumption that it would have been more disruptive to have had plaintiff resume the Application

Manager role, than eliminating plaintiff's position. Statland Tr., at 264-65. Contrasting with Statland's view, plaintiff has presented evidence that OCE had undergone at least three Application Manager changes in the past several years.

Statland did not consult with the Personnel Center to ensure disability law compliance; nor did anyone from there or the legal department contact her to review her recommendation. Statland II Tr., at 139-40.

On June 29, 2005, Statland and Krause met with plaintiff and informed him of his layoff. Specifically, Statland told plaintiff that his position was eliminated as part of the Bank's cost reduction and that his work could be sent off shore at one-third of the cost that the bank paid him. Pl. Ex. R. Plaintiff testified:

> Of course I was completely caught off based by this and couldn't quite understand why my position was being eliminated so I pointedly asked why I was selected and what I was told and I quote, by Mary Ellen Statland and I quote, 'We feel that the 4.0 release took a physical toll on you and you've also had some recent health issues and this will allow you to find a less demanding position, such as a business analyst position.'

Pl. Tr., at 55. Plaintiff testified that he understood that Statland's was referring to his disability. Pl. Tr., at 81. Krause testified that Statland said that "the 4.0 release took a physical toll on you" and that "you've had some recent health issues lately" and that his position being eliminated would "allow you to possibly find something less demanding such as a business analyst." Unlike plaintiff, Krause took such comments

of Statland as not derogatory or negative statements, and that they reflected something that plaintiff had brought up to her previously. Krause Tr., at 262-63; Pl. Ex. 46. Statland does not dispute the statements attributed to her, but claims they were "taken out of context." Statland Tr., at 285-86. Specifically, Statland testified that when she mentioned other potential opportunities in the Bank, plaintiff told her that he did not want to look for a different position, he wanted to stay in his OCE position. She then asked him "why he would want to keep the same position when he previously told me that the 4.0 release had taken a physical toll on him."[6] Statland Tr., at 286. Statland does not deny that she referenced plaintiff finding a less demanding position; she doesn't know if she said that or not. Statland Tr., at 286, 288. Ms. Statland also testified that plaintiff stated in the meeting that he did not want to be treated differently and had not been treated differently.[7] Statland Tr., at 294-95.

The business partners opposed the layoffs of plaintiff and Sparks. Krause Tr. 166; Sylvester Tr. 75. Sylvester was "disappointed beyond belief" and believed the layoff was "nuts" and conveyed her grave reservations about the potential negative impact to her superiors. Pl. Ex. 47; Krause Tr., at 266; Sylvester Tr., at 69. Sylvester also immediately messaged Statland and warned her:

---

[6]    Plaintiff does not recall making this statement.

[7]    Plaintiff denies making this statement.

I am personally disappointed - - as I do have an attachment to Jeff and Gerard - - but I also have concerns that OCE development will suffer. I've had several conversations with Michelle and Les (as have others) long before this decision. We expressed concerns that some of the newer team members do not seem to 'get it' - - at least quickly. It was very frustrating from our perspective and I personally felt that we were spinning out wheels for the last three months. Michelle assured me that the team was moving forward regardless. That said, at least they had experienced teammates to whom they could turn. That experience will go when Jeff and Gerard leave.

Pl. Ex. 40. Similar concerns were raised by Beth Inlander and Mike Dasher and conveyed to Statland. Statland II Tr., at 129. Kreutz and Sylvester testified that plaintiff and Sparks were the last persons on the project they would have expected to be laid off. Kreutz Tr., at 94; Sylvester Tr., at 67.

Plaintiff has also presented evidence that Statland did not accurately testify concerning proactive contacts by business partners concerning the layoffs and that she misled business partners about why and how the layoff occurred. Plaintiff has presented some evidence that Statland was engaged in a deception when she told business partners that the decision to eliminate the two positions was "out of [her] control" and that "senior management" told her that the positions had been eliminated. Sylvester Tr., at 25-26 & 73. Terranova also opposed plaintiff's layoff. Krause Tr., at 313, 315.

After laying plaintiff off in June 2005, Krause concluded in July 2005 that her team needed plaintiff. On July 19, 2005, Krause told Plaintiff that "I've come to

realization my team needs you and added, "I just thought you'd want to know that someone is fighting for you." Pl. Ex. 49. She assumed him, "I'm going to fight and see if we can win" and that "we've got a plan now." Id. Plaintiff reminded her, "you do still remember that I have BIG plans for OCE!" and she replied "oh yes I do remember!!" Krause also got support from Terranova and Burgessor in favor of Plaintiff's extension. Krause Tr., at 278, 285; Terr. Tr., at 173. Krause told Terranova that she was "going to fight for a spot" for plaintiff on GTRM and they discussed that plaintiff's qualifications and skills sets were "definitely needed for that project." Terr. Tr., at 173. Plaintiff thought that Krause was "trying to right a wrong that had happened" and believed that his employment would continue at least until the GTRM project was implemented. Pl. Tr., at 143; Aff. ¶4. Krause says she did her "best" to extend plaintiff and made a "specific" request that plaintiff's employment be extended to work on the GTRM project. Krause Tr. 279 & 283. Krause believed that Statland then did her own research and subsequently reported back to her that "she could not get [the extension] approved." Krause Tr., at 282. Krause was "a little surprised" that Statland did not approve her recommendation because she felt she had earned Statland's trust and confidence. Krause Tr., at 293-94. According to Statland, Krause reported that she was "concerned" for and "upset" about the GTRM project and asked her to extend plaintiff's employment, but claimed that she asked Krause why and for

how long and Krause never responded to her.  Statland Tr., at 297-301. Despite Krause's recommendation, Statland did nothing to follow up with Krause for justification, research the issue on her own, or seek Mr. Globerson's approval of an extension.  Statland Tr., at 302-303, 305; Statland II Tr., at 147. According to Globerson, he would have been open to an extension. Globerson Tr., at 234-35.

It is undisputed that shortly after being terminated Sparks was rehired by the bank, making plaintiff the only employee who lost their employment with defendant in that department under this reduction in force.

## II.    Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56).  There must

be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed

by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252. In the context of employment discrimination, the Court of Appeals for the Fourth Circuit has specifically held, as follows;

> [I]f no rational factfinder could conclude that the [employer's job] action was discriminatory' then the case should not proceed beyond summary judgment . . . [b]ut in the absence of evidence requiring such a conclusion, a *prima facie* case and evidence of pretext raises a sufficient inference of discrimination to entitle a plaintiff to survive a motion for summary judgment.

EEOC v. Sears, 243 F.3d 846 (4th Cir. 2001) (citing Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133 (2000)). In turn, the Supreme Court held in Reeves as follows:

> [A]lthough the court should review the record as a whole, it must disregard all evidence to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from a disinterested witness.

Id., at 2110 (citing C. Wright & Miller, Federal Practice and Procedure, § 2529, p. 299 (2d ed. 1995)).

## III. Discussion

## A.    Defendant's Motion for Summary Judgment on the ADA Claim[8]

Defendant has moved for summary judgment arguing that plaintiff does not have direct evidence of discrimination and cannot make out a *prima facie* case under the shifting burdens of <u>McDonnell Douglas</u> through the use of circumstantial evidence.  Defendant further argues that even if a prima facie case was set forth, plaintiff could not show that defendant's given legitimate business reason for his termination was pretext for discrimination.  When reviewed under a direct evidence standard as well as the shifting burdens of McDonnell Douglas, plaintiff has presented sufficient evidence to require trial.

### 1.    Direct Evidence of Discrimination

While the reduction in force was mandated by Globerson, plaintiff has presented evidence upon which a reasonable fact finder could determine that the actual decisionmakers – to wit, the persons who decided to eliminate plaintiff's position – were Kraus and Statland.  Statland's statement, set forth in detail above, was made in the termination meeting and in response to plaintiff's question of why he in particular was selected for layoff.  Statland's references to "health issues" and "physical toll" and the preferability of a "less demanding" job, if credited by a jury, are direct

---

[8]        To the extent that the NCEEPA provides a private right of action, the following discussion under the ADA is applicable to the NCEEPA claim.

evidence of disability discrimination.  Ms. Statland's statements are in sync with

statements made by Krause, to the effect that plaintiff needed a disability leave and

her reference to his limited use of his hands and typing.  Krause also made statements

to Siegner, in response to what can only be described as a very personal and intimate

attack on plaintiff, that Siegner did not need to worry about plaintiff anymore and that

she would fix the situation.  While the statement to Siegner makes no mention of

disability, it is relevant under Rule 401 as a reasonable inference could arise from such

statement that she had a preexisting motive to remove plaintiff.

Direct evidence of a stated purpose to discriminate will on its own overcome

a motion for summary judgment.  EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th

Cir. 1991). Direct evidence consists of "comments or statements that both reflect

directly the alleged discriminatory attitude and that bear directly on the contested

employment decision." Hill v. Lockheed Martin Logistics Management, Inc.

354 F.3d 277, 284-85 (4th Cir. 2004).

Strikingly similar to the statements allegedly made in this case are the

statements made in other ADA cases, which the Court of Appeals for the Fourth

Circuit found to rise to the level of direct evidence.  In Adams v. Greenbrier

Oldsmobile/GMC/Volkswagen, Inc., 172 F.3d 43,1999 WL 34907 (4th Cir. 1999)[9]

(unpublished),[10] the appellate court overturned a directed verdict based on a similar

supervisor's statement:

> In this case Hunt told Adams that he was being terminated because his
> "health wasn't up for the job." This direct evidence would allow a jury
> to conclude that the reason provided by Hunt was the true reason for
> Adams's termination without having to infer from other facts that
> discrimination motivated the firing. Unlike most statements seen in
> disability cases, Hunt's words do much more than simply refer to
> Adams's disability in a negative light. They specifically identify Adams's
> disability as the reason for the challenged termination. In these
> circumstances, the Proud inference drops out of the case. In short, the
> district court should have allowed the jury to weigh the credibility of the
> witnesses and assess the evidence as a whole to determine if
> discrimination motivated Adams's termination.

Id.,1999 WL 34907, at 6.   The appellate court concluded by stating that this

"statement is tantamount to an admission that the reason that Adams was fired was

because of his disability."   A similar result was reached in Cline v. Wal-Mart Stores,

Inc., 144 F.3d 294 (4th Cir. 1998), where the appellate court found direct evidence

---

[9]     Due to the limits of Electronic Case Filing, a copy of such
unpublished decision is placed in the electronic docket through incorporation of the
Westlaw citation.


[10]     See CTA4 Rule 32.1.  While such unpublished opinion has no
precedential value, the court finds the decision to be highly persuasive as the court
can find no other cases more directly on point.

of disability discrimination where defendant's district manager stated to plaintiff's wife that plaintiff's immediate supervisor informed him that "[plaintiff] could not work but one or two days a week and that he could not hold the pressure that he had had as supervisor ... that he was demoted because of his health" and the immediate supervisor's comment to a potential replacement for plaintiff that he offered him [plaintiff's] position as maintenance supervisor in case [plaintiff] no longer had "the mental capacity to supervise and run the night maintenance crew." Id., at 303.

The court can see no tangible difference in the statements purportedly made in this case and the statements made in Adams and Cline. Finding that plaintiff has proffered direct evidence of disability discrimination in opposition to defendant's Motion for Summary judgment, the court will deny the motion for summary judgment.

## 2. Indirect Evidence of Disability Discrimination

Not only has plaintiff proffered what the Fourth Circuit has found to be direct evidence of disability discrimination, plaintiff has also marshaled indirect evidence of disability discrimination which would satisfy his burden of showing a *prima facie* case of discrimination under a McDonnell Douglas analysis.

To establish a case of disability discrimination in a reduction in force case under the shifting burdens established in McDonnell Douglas v. Green, 411 U.S.792

(1973), plaintiff has the burden to come forward with evidence that: (1) he was an individual with a disability; (2) he was selected from a larger group of candidates; (3) he was performing at a level substantially equivalent to the lowest level of that in the group retained; and (4) the selection process produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing. Corti v. Storage Tech. Corp.,304 F.3d 336, 340 n.6 (4th Cir. 2002); Doe v. University of Maryland Medical Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315 (4th Cir.1993); 42 U.S.C. § 12112(a). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, supra, at 802. If the defendant proffers a non-discriminatory reason for the employment action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. Id., at 804; Reeves, supra, at 147.

### a.    The *Prima Facie* Case

It is undisputed in this matter that plaintiff was an individual with a disability, that he was selected for discharge from among a larger group of employees, and that he was performing his work at a level substantially equivalent to at least the lowest level of the retained group. While defendant would argue that the fourth element is

different, it would appear that under <u>Corti v. Storage Tech. Corp</u> the plaintiff's burden is to produce evidence that the selection process employed by defendant produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing. Plaintiff has amply satisfied his burden as to the fourth element by producing evidence that not only shows that a number of lesser performing unprotected employees were retained, but that plaintiff was in fact the most qualified and valued employee based on the defendant's own value depth chart. Not only has plaintiff produced evidence that he was outperforming others, he has produced evidence that he had done so without incurring disciplinary warnings, unlike a number of unprotected employees who remained after the RIF. Plaintiff has satisfied his burden of establishing a *prima facie* case under <u>McDonnell Douglas</u>.

**b.** **Defendant's Legitimate, Non-Discriminatory Reason for Discharge**

Defendant has satisfied its burden of coming forward with a legitimate, non-discriminatory reason for discharging plaintiff, to wit, that his work was redundant. Specifically, defendant argues that plaintiff occupied one of three "team lead" positions and the decision was made to eliminate two of them. Pl. Ex. 50.

**c.** **Pretext**

Where a defendant satisfies its burden, plaintiff must show by a *preponderance of the evidence* that defendant's legitimate, nondiscriminatory reason was a pretext for discrimination. That burden can be satisfied by plaintiff showing that the reason defendant has put forward is a mere pretext for discrimination and that the plaintiff's disability is the more likely reason for the termination. Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir. 1988), cert denied, 490 U.S. 1107 (1989).

> The question is not whether [defendant] exercised prudent business judgment, . . . but whether [plaintiff] has come forward to refute the articulated, legitimate reasons for his discharge. In this regard, [plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions.

Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)(citations omitted), cert. denied, 479 U.S. 1066 (1987). Consistent with the Court of Appeals for the Seventh Circuit in Dale, the Fourth Circuit reasoned that what is relevant is not a plaintiff's belief that his employment was adversely impacted because of his disability, but "the perception of the decision-maker." Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). See Elliott v. Group Medical & Surgical Service, 714 F.2d 556 (5th Cir. 1983). Feelings or perceptions of discrimination by the employee are irrelevant:

> we have repeatedly explained that "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." Accordingly, the plaintiff's "perception of [her]self . . . is not relevant." Similarly, that plaintiff's coworkers may have thought that [she] did a good job, or that [she] did not 'deserve' [to be discharged], is close to irrelevant."

DeJarnette v. Corning Incorporated, 133 F.3d 293 (4th Cir. 1998)(citations and corresponding quotations omitted). In arguing pretext, plaintiff "bears the ultimate burden of proving that he has been the victim of <u>intentional</u> discrimination." <u>Stokes v. Westinghouse Savannah River Co.</u>, 206 F.3d 420, 429 (4th Cir. 2000)(emphasis added). <u>Intentional</u> discrimination cannot be based on <u>mistaken</u> conclusions of the decision maker.

In this case, there is a threshold consideration of who was the decision maker in this case. While Globerson clearly mandated that efficiencies be found, there is evidence that he ceded his decision making to Krause and Statland. The Court of Appeals for the Fourth Circuit held that

> to survive summary judgment, an aggrieved employee who rests a discrimination claim . . . upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.

<u>Hill v. Lockheed Martin</u>, 2004 WL 25018 (4th Cir. Jan. 5. 2004). Plaintiff has clearly come forward with that Krause and Statland possessed such authority as to be viewed as the ones principally responsible for the decision or the actual decisionmaker for the employer. <u>Id.</u>

Plaintiff can establish prextext by showing "that the [defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence

sufficiently probative of [discrimination]." Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). "In the final steps of this analysis, the trier of fact's 'rejection [or disbelief] of the [employer's] proffered reasons [for its actions] will permit the trier...to infer the ultimate fact of intentional discrimination.'" Wilson v. Phoenix Speciality Mfg. Co., 513 F.3d 378, 387 (4th Cir. 2008) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

> As the Fourth Circuit held in Rhoads, after taking the evidence in the light most favorable to the plaintiff, any resulting reason to disbelieve the defendant's proffered nonretaliatory reason for the disputed action 'is certainly sufficient evidence [for the plaintiff] to overcome [a defendant's] motion for summary judgment.'

Powell v. Bank of America, 2005 WL 2335463, at *8 (W.D.N.C. Sept. 23, 2005) (citing Rhoads v. F.D.I.C., 257 F.3d 373, 394 (4th Cir. 2001)). While there is no evidence that Globerson had any intent other than to reduce costs, there is evidence from which a reasonable jury could infer that both Krause and Statland were motivated by plaintiff's disability in targeting him for the reduction in force (hereinafter "RIF").

> Even if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of its disabled workers.

Matthews v. Edison, 128 F.3d 1194 (7th Cir. 1997). The court finds that plaintiff has presented sufficient evidence of pretext, including evidence from which a reasonable

jury could find the following:

(1)     Krause and Statland targeted the department's MVP for a RIF;

(2)     direct evidence of discriminatory statements and actions by Krause and Statland;

(3)     a shift in defendant's articulated reason for terminating from the termination meeting to its EEOC position statement, Gay v. Timberlake Homes, Inc., 2008 WL 3075588, at 10 (D. Md. Aug. 1, 2008);

(4)     there is conflicting evidence of whether plaintiff was a manager or simply a team member;

(5)     lack of documentation as to the scientific method defendant supposedly employed in deciding to RIF plaintiff;

(6)     failure to RIF other lesser valued team members who had substantial disciplinary issues;

(7)     failure to consider the impact of losing plaintiff on the team's ability to meet deadlines and translate requirements of business partners;

(8)     the conflicting testimony offered by Krause and Statland in justifying their decision to RIF plaintiff;

(9)     the impact on business partners, who were the team's customers, and the reaction of those businesses to news of plaintiff's RIF;

(10)    failure to make any layoffs at the management level where there is evidence of overlap;

(11)    Krause's attempt to retain plaintiff after the RIF is probative of whether plaintiff was essential to the team's operation, as well as conflicting evidence as to why Statland failed to grant the extension;

(12)    plaintiff being substantially more qualified for the team manager position than Terranova; and

(13)    the rehiring of fellow employee Jeff Sparks, who does not suffer from any disability, while plaintiff was not rehired.

Based on a consideration of all the evidence presented, plaintiff has made an appropriate showing of pretext to survive summary judgment.

### B.    Defendant's Motion for Summary Judgment on the NIED Claim

The essential elements of a claim for negligent infliction of emotional distress include the following:

1.    the defendant <u>negligently</u> engaged in conduct;

2.    it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress or mental anguish; and

3.    the conduct did in fact cause the plaintiff severe emotional distress.

<u>Pardasani v. Rack Room Shoes. Inc.</u>, 912 F. Supp. 187, 192 (M.D.N.C. 1996). The only act plaintiff has alleged is the unlawful termination of his employment based on his disability, which is by its very nature an intentional act. This manner of pleading negligent infliction has long been held to be insufficient:

> The district court likewise dismissed Mitchell's negligent infliction of emotional distress claim after holding that this tort requires a showing of outrageous conduct. We decline to review that holding because we believe the negligent infliction claim should have been dismissed for a more basic reason: Mitchell's complaint does not allege any negligent acts by Lydall. <u>See Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.</u>, 395 S.E.2d 85, 97 (N.C.1990) ("to state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, . . ."). Mitchell's complaint contains merely a single, conclusory allegation that Lydall was negligent; the material factual allegations charge nothing but intentional acts by Lydall in failing to accommodate Mitchell's MS condition and in discharging him. Taking these material factual allegations as true and construing them in the light most favorable to Mitchell . . . we must conclude that they do not state a claim for negligent infliction of emotional distress.

<u>Mitchell v. Lydall, Inc.</u>, 1994 WL 38703, *3 (4th Cir. 1994). A claim for *negligent* infliction of emotional distress is, therefore, subject to dismissal when "the material factual allegations charge nothing but intentional acts . . . ." <u>Id.</u>

Inasmuch as plaintiff relies solely on the allegation of intentional disability discrimination, the court will grant defendant's Motion for Summary Judgment on plaintiff's NIED claim and dismiss such with prejudice.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant's Motion for Summary Judgment is **DENIED** as to plaintiff's ADA claim, and is **GRANTED** as to plaintiff's NIED claim, and the NIED claim is dismissed with prejudice.

Signed: November 26, 2008

Dennis L. Howell
United States Magistrate Judge